## DAVID C. RYDER *versus* MELATIAH HATHAWAY.

In 1778, J. A. conveyed a parcel of land described as " part of the lot of swamp which D. S. bought of P. A." It was *held*, that this recital, being confirmed by evidence of the running of lines, by agreement, between such part of the lot and the residue, and of the occupation of the land conformably to those lines from 1778 to 1830, would warrant the jury in presuming the existence of a deed from D. S. to J. A.

If A intentionally intermingle his own goods with others of the same quality and value belonging to B, but which A supposed to be his own, such intermixture does not devest A of his property in those which did in fact belong to him ; and if B, knowing that a part of the goods belong to A, take away the whole, he is responsible to A in trespass, for the value of A's goods ; or if he take the goods, without such knowledge, although not liable in trespass, he may be in assumpsit, if he has sold the goods, or in trover, after a demand and refusal, if he has not sold them.

But if A, in such case, knew that a portion of the goods were not his own, or if he doubted, whether they were or not, and intermingled them in order to mislead B, and prevent him from taking his portion, without danger of taking those of A, then A has, by such fraudulent act, lost his own property, and can have no remedy.

THIS was trespass against the defendant for taking, carrying away and converting to his own use twenty-three cords of wood.

The defendant justified the taking, on the ground, that the wood was cut upon his land, without right, and was his property, or that if any wood was taken by him, belonging to the plaintiff, it was because, by the plaintiff's own wrong, it had been so mixed with the defendant's wood that it could not be distinguished. The plaintiff contended, that the wood was cut upon his own land.

The trial was before *Shaw* C. J. It appeared, that the wood in question was cut by the plaintiff on a tract of wood land in Dartmouth, known as the Ponegansett Cedar Swamp, and hauled out to a landing-place on the margin of the swamp, the soil of which belonged to the defendant; and that it was afterwards carried away by the defendant.

It was assumed by both parties, that the land in dispute was part of an eight acre lot, so called, originally laid out by the proprietors of common and undivided lands in Dartmouth to Joseph and John Allen. In 1720 Joseph and John Allen made a division of the lot by a line drawn easterly and westerly through the middle, the northerly half, including the land in dispute, being assigned to John, and the southerly half to Joseph. John Allen, in his will, dated on the 9th of November, 1751, made a devise to his son Philip Allen, the terms of which were sufficient to include the northerly half of the eight acre lot; and on the 22d of March, 1768, Philip Allen conveyed the same in terms to David Shepard. In 1788, David Shepard devised to his four sons, David, Gideon, Allen and Jonathan, all his lots in the swamp, without specifying the lot in question, the devise being sufficient however in terms to pass 't, if the testator died seised of it. In 1791, David Shepard, the younger, conveyed to his brother Gideon, all his right to the lands devised to him by their father. Gideon Shepard subsequently died intestate, leaving one child, Caleb Shepard, from whom the plaintiff derived his title.

The plaintiff also offered evidence proving, that the title to the northerly portion of the southerly half of the eight acre lot, which was originally assigned to Joseph Allen, vested in Judah Allen in 1761, and was conveyed by him to his son, Joshua Allen, in 1764.

The defendant offered in evidence a deed from Joshua Allen

to Melatiah Hathaway, the grandfather of the defendant, dated on the 30th of January, 1778, and recorded on the 16th of December, 1783, conveying a tract of land described as " being part of the lot of swamp which David Shepard bought of Philip Allen, it being one half of said lot from the path across the lot, on an island of upland in the swamp, then westward to the river, and then all the west end of said lot to the upland " of one Hart.   But no conveyance was proved from David Shepard to Joshua Allen ; nor did it appear upon what grounds Joshua Allen claimed title to or power to sell such land.

The defendant further offered in evidence the will of Melatiah Hathaway, dated in 1801 and proved in 1808, by which he devised to his son Henry Hathaway, " my lot of cedar swamp that I purchased of Joshua Allen." Henry Hathaway died intestate, soon after his father, leaving three children, one of whom was the defendant.   The defendant subsequently purchased the shares of the other two children.

The defendant also offered evidence to prove the running of lines by mutual consent, and the actual occupation of the land on each side of the lines, as claimed by him.   This evidence was objected to, but was admitted as corroborative evidence of a lost deed, and also as tending to prove a disseisin of those under whom the plaintiff claimed.

In respect to this evidence, the jury were instructed, that the recital in the deed from Joshua Allen to Melatiah Hathaway, the elder, in 1778, together with the evidence of the running of lines, by mutual agreement, and of the actual occupation of the land conformably to those lines, and acquiescence therein from 1778 until about 1830, the time of the sale and conveyance by Caleb Shepard, under whom the plaintiff claimed title, was competent evidence, from which they might infer, if they were satisfied with the sufficiency of it, that a deed conveying the land in dispute, had been made by David Shepard to Joshua Allen or to his father, Judah Allen.

There was also evidence tending to show, that a part of the wood taken away by the defendant was cut by the plaintiff from other lots not in controversy ; and the plaintiff claimed a right to recover damages for the wood, whether he did or did not establish his title to the lot from which the residue was taken

In respect to this evidence, the jury were instructed, that if the plaintiff took the wood without right from land to which the defendant had title, the defendant had a right to take it away ; that if the bulk of the wood was taken from the defendant's land, but a part of the plaintiff's own wood was so mixed with the defendant's wood in the same pile, either that the defendant did not know it, or could not, by any reasonable examination, distinguish it, the taking of such part was not a trespass, for which this action would lie ; *à fortiori*, if it was so done wilfully or fraudulently, in order to expose the defendant to the danger of taking some of the plaintiff's wood, in case he should take his own ; but that it would be otherwise, if the defendant knew that a part was the plaintiff's wood, and could, by reasonable care, distinguish and separate it.

The jury having returned a verdict for the defendant, the plaintiff moved to set it aside on the grounds, that the jury were misdirected in matters of law, and that it was against the evidence and the weight of the evidence.

*Coffin* and *Ezra Bassett*, for the plaintiff, cited, to the point that the defendant's claim could be traced to a mistake, and this rebutted any presumption of a deed from D. Shepard to Joshua Allen, Mathews on Presumptive Evidence, 198 ; that the question, whether the facts would warrant the presumption of a deed, was a mixed question of law and fact, *Bank of the United States* v. *Corcoran*, 2 Peters's Sup. Court R. 133 ; and, that legal presumptions apply to facts of a transitory nature only, and not to things which should be on record, *Brunswick* v. *McKean*, 4 Greenl. 511.

*Warren* and *Eliot*, for the defendant, to the point, that the jury had a right to presume the existence of a deed from the circumstances proved, cited *Clark* v. *Faunce*, 4 Pick. 245 ; *Jackson* v. *Lamb*, 7 Cowen, 431 ; *Rust* v. *Boston Mill Corporation*, 6 Pick. 158 ; *Jackson* v. *McCall*, 10 Johns. R. 377 ; *Jackson* v. *Murray*, 7 Johns. R. 5 ; *Ricard* v. *Williams*, 7 Wheat. 109 ; 3 Stark. on Evid. 1227, 1230 ; and as to the questions arising from the alleged confusion of the property, 2 Kent's Comm. 297 ; *Parker* v. *Walrod*, 13 Wendell, 296 ; *Gordon* v. *Jenney*, 16 Mass. R. 465.

*Ryder*
*v.*
*Hathaway*

*Oct. 26th*

MORTON J. delivered the opinion of the Court. This is trespass *de bonis asportatis*, in which the plaintiff claims to recover for twenty-three cords of wood.

It appeared in evidence, that the defendant took a certain quantity of wood, but he justified the taking, on the ground, that the plaintiff had cut and carried the wood from his land, and so that the wood was his, and he had a lawful right to take t. The wood in controversy was cut by the plaintiff and removed by him to a landing-place by the shore of the swamp, the soil of which was owned by the defendant. From this place the defendant carried it away. If the wood was really cut upon the defendant's land, the cutting and removing it by a wrong-doer would not divest him of his property in the wood, and he might lawfully remove it from the place where the plaintiff had put it.

The principal question in the case relates to the title of the and on which the wood grew. The parties attempted to trace heir respective titles from Joseph and John Allen, to whom it was originally laid out. In 1720 John and Joseph Allen made a division by a line running east and west through the lot, *John* taking the *northerly* and *Joseph* the *southerly* half. The *locus in quo* is in the *northerly* half. John Allen devised it, in 1754, to Philip Allen, his son. In 1768 Philip Allen conveyed it to David Shepard, who in 1788 devised it to his four sons. In 1791, one of them conveyed his share to his brother Gideon. This vested an undivided moiety in Gideon, which descended to his son and sole heir, Caleb Shepard, who conveyed it to the plaintiff.

The defendant commences his title with a deed from Joshua Allen. In 1778 Joshua Allen conveyed to Melatiah Hathaway a tract of land, being part of the lot of swamp which David Shepard bought of Philip Allen, and describes it, by boundaries, as a several half. No conveyance from David Shepard to Joshua Allen is produced ; but the defendant contends, that the circumstances disclosed warrant a presumption, that such a deed was made, and this is one of the questions reserved for our consideration. Melatiah Hathaway, by will approved in 1808, devised the *same swamp* to Henry Hathaway. From Henry Hathaway it descended to his three chil-

dren, one of whom is the defendant, and he has acquired by purchase the rights of the other two in this swamp.

From the above recital it appears, that the plaintiff establishes a title, upon his own construction, only to an undivided moiety of the *locus in quo*. But, as a tenant in common, he may well maintain his action against a stranger ; and it is immateria. whether his title, if good, covers the whole or is limited to an undivided half. It equally puts the defendant on his title

We have no doubt, that conveyances of real estate, if the circumstances will warrant it, may well be presumed. Acts of parliament and records, as well as deeds and grants, may be presumed from lapse of time and other circumstances. Nor does the statute requiring a registry of deeds of real estate, necessarily defeat the presumption of such a deed. It may affect its operation ; but it is well known, that unregistered deeds will be effectual in many cases, to pass real estate. This subject has been fully considered and settled in the recent case of *Melvin* v. *Locks and Canals,* 17 Pick. 255.

Nor do we doubt, that the evidence in this case, which is too voluminous to recite in detail, fully warrants the presumption. The recital in the deed of Joshua Allen to Hathaway is, of itself, strong evidence of the existence of a prior deed from Shepard to Allen ; this is confirmed by many other circumstances in the case. So the running of lines, and the mode of occupying, strongly support the recital, that the deed was of a specific part of the lot in severalty.

Now as the plaintiff derives his title from David Shepard, through several descents and mesne conveyances, if David Shepard had previously conveyed one half in another channel, it clearly could not pass to the plaintiff or any of his grantors. And in this connexion, it may be well to remark, that so gene ral are the conveyances from David Shepard down, that the language of the deeds may as well be satisfied by one half as the whole.

Upon a careful revision, we are well satisfied, that in reference to the title, the instructions were correct, and the finding of the jury warranted by the evidence.

But in the next branch of the case we have found much greater difficulties.

Ryder
v.
Hathaway.

It appeared, that a part of the wood taken by the defendant, had been cut and carried to the landing-place by the plaintiff from land indisputably his own. For this part, he contended that he had a right to recover, however the title to the other lot might be decided. In relation to this part of the case, the jury were instructed, that if " a part of the plaintiff's own wood was so mixed with the defendant's wood in the same pile, either that the defendant did not know it or could not by any reasonable examination distinguish it, the taking of such part was not a trespass for which this action would lie." Now if, under any circumstances, the taking of wood thus mixed might be a trespass, this general instruction would need some qualification, and without it would be incorrect, and might mislead the jury. And although, in all other respects, the instructions are right, and this may need but a slight modification, yet even that, under our practice, must lead to a new trial.

Few subjects in the law are less familiar, or more obscure, than that which relates to the confusion of property. If different parcels of chattels, not capable of being identified, owned by different persons, get mixed, how are they to be severed ? What are the relative rights of the different owners ? Take, for example, grain or liquor. Can each one of the former owners take from the common mass his proportion, or do they become tenants in common of the whole ? If one takes the whole, what shall be the remedy ? Will trespass lie ? If they become tenants in common, clearly not. There is some conflict on this subject between the common law and the civil law. If the intermixture takes place by accident, or without the fault of the parties, it would be very unreasonable to deprive either party of his property or materially to affect his right to it. And yet oftentimes there must be great suffering, as by the confusion of property of different kinds and qualities, as of different kinds of grain or liquors, the intermixture of which would greatly impair, if not entirely destroy the value of the whole. But it will not be useful further to consider the intermixture of property by accident, as it will not have much application to the case under consideration.

The cases of *intentional* intermixture, present questions of greater perplexity. If the owners of goods incapable of being

identified consent to intermix them, their consent makes them tenants in common. But if the property be wilfully and unlawfully intermingled, it clearly cannot constitute a tenancy in common, because a person cannot be made a tenant in common or copartner without his consent. The act of God or of the law may create such a confusion of the property of different owners, as necessarily to constitute a community of property between them. But no one person, by his own act, can compel another to become his cotenant.

By the rules of the civil law, if the intermixture was made wilfully and not by mutual consent, he who made it acquired the whole ; and the only remedy for the other party was a satisfaction in damages for the property lost. Vinn. ad Inst. *lib.* 2, *tit.* 1, § 28. This rule seems to be very imperfect, as it would enable one person to acquire the property of another against his will, merely rendering himself liable to pay the value of it. But it undoubtedly went upon the ground, that the intermixture was a conversion, and, in this respect, is analogous to many cases of trover and trespass. But our law adopts an entirely opposite rule. That very learned commentator, Chancellor *Kent*, in 2 Kent's Comm. 297, says " the common law, with more policy and justice, to guard against fraud, gave the entire property, without any account, to him whose property was originally invaded and its distinct character destroyed. If A will wilfully intermix his corn or hay with that of B, so that it becomes impossible to distinguish what belonged to A from what belonged to B, the whole belongs to B." *Hart* v. *Ten Eyck*, 2 Johns. Ch. R. 62.

But this rule only applies to wrongful or fraudulent intermixtures. There may be an intentional intermingling, and yet no wrong intended ; as where a man mixes two parcels together, supposing both to be his own, or that he was about to mingle his with his neighbour's, by agreement, and mistakes the parcel. In such cases, which may be deemed accidental intermixtures, it would be unreasonable and unjust, that he should lose his own, or be obliged to take his neighbour's. If they were of equal value, as corn, or wood, of the same kind, the rule of justice would be obvious. Let each one take his own given quantity. But if they were of unequal value the rule would

Ryder
*v.*
Hathaway.

be more difficult. And if the intermixture was such as to destroy the property, the whole loss should fall on him whose carelessness or folly or misfortune caused the destruction of the whole. This doctrine is recognised and discussed by Lord *Eldon*, in *Lupton* v. *White*, 19 Ves. 432. See also *Panton* v. *Panton*, cited in 15 Vesey, 442 ; Story on Bailments, § 40 ; Ayliffe's Pand. *lib.* 3, *tit.* 3, *p.* 291 ; Ersk. Inst. *bk* 2, *tit.* 1, § 17 ; 2 Dane's Abr. 119

The ntentional and innocent intermixture of property of substantially the same quality and value, does not change the ownership. And no one has a right to take the whole, but in so doing commits a trespass on the other owner. He should notify him to make a division, or take his own proportion at his peril, taking care to leave to the other owner as much as belonged to him. It must already have been perceived, that these principles are not perfectly consistent with the unqualified rule laid down for the government of the jury.

According to the above doctrine, if the plaintiff actually supposed, that the land from which the wood was taken was his own, and that all the wood was his, then the mingling it together should not divest him of that which honestly belonged to him. But if he knew that the land was not his, or if he doubted whether it was his or not, and mixed the wood, with an intent to mislead or deceive the defendant, and to prevent him from taking his own without danger of taking the plaintiff's, then he has by his own fraudulent act lost his property and can have no remedy. But if, as above stated, the plaintiff mingled the wood from the different lots, supposing all of it to be his own, and if the defendant, knowing that some part of the wood came from the plaintiff's land, took the whole, he was a trespasser and is responsible in this action for the value of the plaintiff's wood thus taken by him. But if the defendant took the wood without any knowledge that any of it belonged to the plaintiff, then he is not liable in an action of trespass, though he may be in *assumpsit*, if he has sold the wood, or if not, in trover, after a demand and refusal. *Bond* v. *Ward*, 7 Mass. R. 127.

The verdict must therefore be set aside, and a new trial granted. But as the question of title has been fully and fairly

tried and settled, there can be no reason for retrying that, and the new trial must be confined entirely to the question of damages.